UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| LARRY WHITE, JR., | ) | CASE NO. 5:12CV1637 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| CAROLYN COLVIN[1], | ) | **REPORT AND RECOMMENDATION** |
| ACTING COMMISSIONER OF | ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |


Larry White, Jr. ("Plaintiff") seeks judicial review of the final decision of Carolyn Colvin ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying his application for Supplemental Security Income ("SSI").  ECF Dkt. #1.  For the following reasons, the undersigned recommends that the Court AFFIRM  the Commissioner's decision:

## I.      PROCEDURAL AND FACTUAL HISTORY

On June 24, 2009, Plaintiff filed an application for SSI, alleging disability beginning on January 1, 1991 due to a brain aneurysm, anxiety, asthma and chronic back pain.  ECF Dkt. #12 at 124-126, 141.  The SSA denied Plaintiff's applications initially and on reconsideration.  *Id*. at 74-76.  Plaintiff filed a request for an administrative hearing and on February 11, 2011, an ALJ conducted an administrative hearing.  *Id*. at 29.  At the hearing, Plaintiff amended his alleged onset disability date to June 24, 2009 and the ALJ heard testimony from Plaintiff, who was represented by counsel, and a vocational expert ("VE").  *Id*. at 29, 135.

On March 15, 2011, the ALJ issued a decision denying benefits.  ECF Dkt. #12 at 13-24. Plaintiff filed a request for review of the decision, but the Appeals Council denied the request.  *Id*. at 1-9, 183-186.

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

On June 25, 2012, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. On December 7, 2012, Plaintiff filed a brief on the merits. ECF Dkt. #14. On January 22, 2013, Defendant filed a brief on the merits. ECF Dkt. #15. On February 5, 2013, Plaintiff filed a reply brief. ECF Dkt. #16.

## II.    RELEVANT MEDICAL HISTORY

While incarcerated on a burglary conviction in 2004, Plaintiff suffered a brain aneurysm. ECF Dkt. #12 at 210. He was also treated for asthma, hypertension and depression and received medications for each condition. *Id*. at 191-199.

On July 2, 2009, Plaintiff presented for medication refills and a general medical examination at the Internal Medical Center. ECF Dkt. #12 at 269. Plaintiff complained of low back pain and uncontrolled hypertension. *Id*. at 268. No abnormalities were found upon physical examination and his aneurysm was noted, as well as the aneurysm repair. *Id*. at 269.

On July 21, 2009, Plaintiff presented to the Internal Medical Center for general medical treatment. ECF Dkt. #12 at 265. He indicated that he was there "to prove he is disabled." *Id*. It was noted that Plaintiff had a history of a cerebral aneurysm and he stated that he was unable to bend over or get on his knees, and he had trouble standing and walking. *Id*. Upon physical examination, Dr. Shaw found no abnormal results and concluded that there was "[n]o evidence of grounds for disability." *Id*. at 266.

On September 1, 2009, Plaintiff's counselor at Portage Path Behavioral Health completed a daily activities questionnaire indicating that Plaintiff had no problems that kept him from independent living, he had no problems getting along with family, friends, former employers, supervisors and co-workers, he attended church, he was reliable and prompt, and he was taking his medications as prescribed. ECF Dkt. #12 at 201-202. On the same date, the same counselor and a  clinical nurse specialist completed a mental status questionnaire indicating that Plaintiff had appropriate flow of conversation and speech, no signs or symptoms of anxiety, and no problems maintaining attention, socially interacting, or dealing with pressures in work settings involving simple, routine, or repetitive tasks. *Id*. at 207. They noted that Plaintiff had some short-term memory loss and could not stand for long periods of time due to chronic back pain. *Id*. They

diagnosed him with major depressive disorder and intermittent explosive disorder. *Id.*

On September 29, 2009, Dr. Castor examined Plaintiff at the request of the agency. ECF Dkt. #12 at 210. He indicated that Plaintiff's chief complaint was his aneurysm and he related the medical history surrounding the aneurysm as told to him by Plaintiff. *Id.* Plaintiff told him that he suffered the brain aneurysm in 2004 while incarcerated after he passed out and he stayed in a coma for two weeks. *Id.* Plaintiff related that since that time, he has had difficulty lifting over ten pounds, he has tingling in his feet, and he has poor control of his left foot. *Id.* He also complained that he could not walk far, no more than 1/3 mile, and he was unable to crouch down and bend back up because of the leg weakness he experienced. *Id.* Dr. Castor indicated that Plaintiff did participate in physical therapy after his aneurysm repair and he arrived at the appointment with a cane, explaining that he needed it for balance because of his leg weakness. *Id.* at 210-211. He also related that Plaintiff had no other complaints. *Id.*

Upon examination, Dr. Castor noted that Plaintiff had left leg weakness with flexion and extension and he had a gait favoring his left side. ECF Dkt. #12 at 211. Neurological examination revealed normal results. *Id.* Radiological tests showed a normal lumbosacral spine and chest. *Id.* at 213. Dr. Castor diagnosed left leg weakness and status post aneurysm repair in 2004. *Id.* Based upon his examination and Plaintiff's complaints of left leg weakness, inability to crouch down and inability to pick up items heavier than ten pounds, Dr. Castor opined that Plaintiff could tolerate standing up to two hours during an eight-hour day, sitting up to eight hours per day and could perform jobs with limited mobility and without a requirement of crouching down and standing back up again. *Id.* at 211-212.

On October 14, 2009, Dr. Leidal conducted an interview and mental status examination of Plaintiff for the agency. ECF Dkt. #12 at 218. He noted that Plaintiff told him that he could not work because "I had an aneurysm in 2004 which limits me physically, I can't do lifting like I used to, my balance is off and I tend to fall down a lot, and have a bad back. My short-term memory is real bad too." *Id.* at 219. Plaintiff further related that although he went to school only through the tenth grade, he received his GED and completed a year and a half of college courses toward an Associate's Degree in Microcomputing and Small Business while he was incarcerated. *Id.* Plaintiff

also indicated that he had prior adult convictions for robbery, receiving stolen property and attempted burglary, and had served a total of fifteen years in prison before being released in May of 2009 from his most recent conviction with a seven-year sentence. *Id.* Dr. Leidal noted that Plaintiff's psychiatric records were not available to him. *Id.* at 220.

Plaintiff explained his medical history, including the aneurysm, and he related that he continued to experience problems with balance and coordination therefrom, although he was not under medical care. ECF Dkt. #12 at 220. Dr. Leidal also noted that Plaintiff had a psychiatric history which included diagnosis and treatment for depression and anxiety while he was in prison. *Id.* Plaintiff indicated that he received medication and counseling at the prison which he thought was effective, but he was not on medication at the time that he interviewed with Dr. Leidal and he refused medications because he felt that he did not need them. *Id.* Plaintiff acknowledged that he experienced several mild to markedly severe depressive and anxiety related symptoms and Dr. Leidal noted dysfunctional personality characteristics of an avoidance, paranoid, dependent, and antisocial nature. *Id.*

Upon examination, Dr. Leidal found that Plaintiff was alert and oriented to person, place and time, he avoided eye contact, and was fairly motivated for the exam. ECF Dkt. #12 at 221. Dr. Leidal found Plaintiff's flow of thought content to be normal, with average ability to communicate with an ability to understand and comprehend simple language, and fair to below average ability to understand more complex directions and language. *Id.* Plaintiff's affect was normal, with a stable mood, no overt signs of anxiety, and his mental content appeared normal, with Plaintiff denying aggressive or violent behaviors. *Id.* Plaintiff's recall was fair and his ability to attend to mental status questioning was not markedly distracted or obtunded. *Id.* His mental organization and common sense reasoning were fair, and his general fund of information and intelligence level were in the average range. *Id.* Dr. Leidal found Plaintiff's judgment to be fair to below average, and his abilities to problem-solve and consider alternatives, to determine outcomes of events or behaviors, his consequential thinking and ability to understand how his behavior affects others to be below average or poor. *Id.* at 221-222.

-4-

Dr. Leidal also noted Plaintiff's daily activities as walking around the downtown area, reading his Bible, and going to the library and getting on the internet.  ECF Dkt. #12 at 222. Plaintiff reported no sleep problems, fair energy levels, and no problems waking up in the morning, getting dressed, bathing, and caring for his personal hygiene.  *Id*.  He was independent in his adaptive living skills, had no problems using transportation, and he could manage money.  *Id.*

In summary, Dr. Leidal concluded that Plaintiff's most serious symptom was a moderately depressed and anxious mood.  ECF Dkt. #12 at 222.  He diagnosed Plaintiff with depressive disorder not otherwise specified and personality disorder not otherwise specified, and he opined that Plaintiff's most serious functional problems were moderate to marked impairment in social and occupational functioning and judgment.  *Id*. at 222-223.  He further opined that Plaintiff had moderate impairment in relating to others and responding to changes with reasonable flexibility, but he had a moderate to marked impairment in accepting instruction or criticism and responding to instruction in a work setting.  *Id*. at 223.  Dr. Leidal also opined that Plaintiff's ability to recall, remember, execute, and maintain attention and concentration to simple work-related tasks was not impaired.  *Id.* at 223.  He found that Plaintiff was moderately limited in his abilities to sustain an ordinary routine without supervision or prompting, his ability to complete routine daily tasks or work-related tasks, and his pace for task completion.  *Id*.  Dr. Leidal opined that Plaintiff had no impairment in understanding, following and executing short and simple or more detailed instructions or directions, but he had moderate impairment in understanding, comprehending and executing more complex levels of instructions and directions.  *Id.*  He found that Plaintiff had moderate impairment in performing activities within a schedule or maintaining attendance and being punctual.  *Id*.  He concluded that from a psychological perspective, Plaintiff had no impairment in his ability to actually obtain productive employment without assistance.  *Id*.  He opined that Plaintiff's ability to maintain employment, adapt to a work environment, and tolerate the stressors of a work environment was moderately to markedly impaired.  *Id*.

On October 21, 2009, Dr. Waggoner completed a  mental RFC and psychiatric review form for the agency upon review of Plaintiff's records.  In completing the psychiatric review technique form, Dr. Waggoner examined Plaintiff's conditions under Listing 12.04 for affective disorders and

Listing 12.08 for personality disorders.  *Id*. at 227-38.  In examining the "B" criteria for these Listings, Dr. Waggoner concluded that Plaintiff was mildly limited in his daily living activities and in maintaining concentration, persistence or pace, and moderately limited in social functioning.  *Id*. at 237.  She also found that the "C" criteria were not met.  *Id.* at 240.  She concluded that Plaintiff had no limitations in:  understanding and memory; carrying out very short and simple instructions; performing activities within a schedule; maintaining regular attendance; being punctual; sustaining an ordinary routine without special supervision; working with or near others without being distracted by them; making simple, work-related decisions; asking simple questions or asking for help; maintaining socially appropriate behavior; being aware of normal hazards and taking appropriate precautions; traveling in unfamiliar places or using public transportation; and in setting realistic goals or making plans independently of others.  *Id*. at 241-242.  Dr. Waggoner found Plaintiff moderately limited in the abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms; accept instructions and responding appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or displaying behavioral extremes; and respond appropriately to changes in the work setting.  *Id*.  She found Plaintiff to be markedly limited only in the ability to interact appropriately with the general public.  *Id*. at 242.  Dr. Waggoner found that Plaintiff was capable of routine and more complex tasks in a slower paced environment with no interaction with the general public.  *Id.* at 243.

In explaining her findings, Dr. Waggoner indicated that she had reviewed the limited records, the consultative examination by Dr. Leidal and Plaintiff's treatment records from Portage Path, although she noted that the source signing the assessment at Portage Path was not an acceptable source for treating physician purposes.  ECF Dkt. #12 at 243.  She nevertheless indicated that she had considered those records as well.  *Id.*

On March 11, 2010, Dr. Goldsmith affirmed Dr. Waggoner's findings.  *Id*. at 246.

On November 26, 2009, Dr. McCloud conducted a file review for the agency and opined that Plaintiff was not severely limited by his physical impairments.  ECF Dkt. #12 at 245.  He noted that Plaintiff's neurological examination at the consultative examination was completely normal and his

-6-

spine and chest x-rays were normal.  *Id*.  He found Plaintiff's statements only partially credible because the prison records failed to mention the aneurysm repair even though they went back to March 29, 2001.  *Id.*  He also noted that Plaintiff appeared at the consultative exam with a cane, which was not prescribed or otherwise mentioned in his medical history and Plaintiff stated in his activities of daily living that he could walk half a mile, stated at the consultative exam that he could walk 1/3 of a mile, but then stated that he could only stand for five minutes.  *Id*.  Dr. McCloud also cited to the psychological consultative examination's findings that Plaintiff's gait was normal and unencumbered and the fact that Plaintiff stated on his daily living activities form that he had a cane prescribed but he did not use it anymore.  *Id.*  Finally, Dr. McCloud gave only partial weight to Dr.Castor's conclusions because while Dr. Castor opined a sedentary RFC, his examination of Plaintiff was essentially normal.  *Id.*  He also noted the inconsistent findings of Dr. Castor that while Plaintiff had 3/5 strength in his hips, he could partially stoop, could walk 1/2-1/3 miles and could get on and off the exam table.  *Id.*  Accordingly, Dr. McCloud opined that Plaintiff had no medically determinable severe physical impairment.  *Id.*

On February 18, 2010, Plaintiff presented to the Internal Medical Center for follow up for his asthma and hypertension.  ECF Dkt. #12 at 262.  The medical note indicated that Plaintiff presented mainly for lower back pain which he started noticing after his aneurysm and which he stated he may have originally hurt in high school.  *Id*.  He also mentioned short-term memory loss from the aneurysm, but indicated that it had not gotten worse since his repair surgery.  *Id.*

On April 2, 2010, Dr. Hinzman affirmed the findings of Dr. McCloud with regard to Plaintiff's physical impairments.  ECF Dkt. #12 at 247.  He noted that Plaintiff had no treating physicians for his asthma, back pain and history of aneurysm repair.  *Id*.  He further cited to the initial consultative examination, which showed Plaintiff to be exaggerating the severity of his impairments as he appeared with a cane and limped, even though no historical information indicated the need for a cane, he stated on a activities of daily living form that he could walk a ½ mile, and the psychological exam consultant described Plaintiff's gait as normal and unencumbered.  *Id*.

On May 10, 2010, Plaintiff presented for follow up at the Internal Medical Center after his recent hospitalization for chest pain, which revealed normal blood work and EKG, as well as a

normal stress test.  ECF Dkt. #12 at 259.  Physical examination revealed normal results and he was diagnosed with hypertension, asthma not otherwise specified, insomnia, and gastroesophageal reflux disease ("GERD").  *Id.* at 260.

On August 5, 2010, Plaintiff presented to the emergency room complaining of urinary frequency and mild flank pain.  ECF Dkt. #12 at 469.  He was diagnosed with Type 2 Diabetes with significant hyperglycemia and treated with medications.  *Id.* at 469.

On August 9, 2010, Plaintiff presented to the emergency room for complaints of vomiting and diarrhea.  ECF Dkt. #12 at 359.  A physical examination, chest x-ray and blood tests revealed essentially normal results and Plaintiff was given an IV and medication.  *Id*

On August 10, 2010, Plaintiff presented to the emergency room complaining of facial swelling.  ECF Dkt. #12 at 346.  Upon examination, right-sided infraorbital swelling was noted.  *Id*.  Plaintiff was administered benadryl for likely acute reaction to diabetes medication.  *Id*.

On August 11, 2010, Plaintiff followed up at the Internal Medical Center for complaints of nausea and vomiting and facial swelling after taking a medication for his newly diagnosed diabetes mellitus.  ECF Dkt. #12 at 256.  Plaintiff's physical examination was normal but for the facial swelling and he was in no apparent distress.  *Id.* at 257.  He was diagnosed with hypertension, GERD, hyperlipidemia, uncontrolled diabetes mellitus type 2 and angioedema.  *Id.*

On August 16, 2010, Plaintiff was admitted to the hospital complaining of right eye swelling and right temporal facial swelling for the last two weeks.  ECF Dkt. #12 at 384.  It was noted that Plaintiff had a past history of a ruptured brain aneurysm that was repaired in January of 2005.  *Id.*  Physical examination revealed significant swelling of Plaintiff's right eye and swelling in the region of his previous craniectomy scar.  *Id.*  A CT of the head showed a possible abscess and osteomyelitis.  *Id.* at 392.  Plaintiff was taken to surgery where a right frontal craniectomy was performed with debridement and draining.  *Id*.  Plaintiff also noticed on the fourth day of his hospitalization that his right arm began to swell.  *Id*. at 387.  An ultrasound showed that he had a right upper extremity superficial thrombophlebitis which was treated.  *Id*.at 435.  He was discharged from the hospital on August 24, 2010 to a skilled nursing facility, where he remained until October 14, 2010 in order to receive IV antiobiotics.  *Id.* at 282-290, 384.

On September 3, 2010, Dr. Muakkassa examined Plaintiff and noted that his wound from the craniotomy looked well and the sutures were removed.  ECF Dkt. #12 at 500.

On October 18, 2010, Plaintiff followed up for general treatment at the Internal Medical Center following his release from the nursing home.  ECF Dkt. #12 at 250.  No abnormal examination findings were made and he was diagnosed with Type 2 uncontrolled diabetes mellitus, hypertension, asthma, insomnia, GERD, and osteomyelitis, status post IV antibiotics.  *Id.* at 250-254.

On December 2, 2010, Dr. Muakkassa examined Plaintiff on follow up for his osteomyelitis.  ECF Dkt. #12 at 499.  He noted that Plaintiff had the craniectomy done in August of 2010 and he had no problems following that surgery and his doctor had found in October of 2010 that he was doing well.  *Id.*  Dr. Muakkassa ordered a brain MRI to make sure no residual infection remained and indicated that a cranioplasty would be considered in January of 2011.  *Id.*  The December 27, 2010 brain CT showed interval resolution of soft tissue inflammatory changes and fluid collections with no clear evidence of active infectious or inflammatory process.  *Id.* at 507.

On December 7, 2010, Plaintiff was discharged from Portage Path, with Portage Path indicating that its last contact with Plaintiff was July 27, 2010. ECF Dkt. #12 at 320.  The discharge summary indicated that Plaintiff's presenting problems were depression, angry outbursts, housing and financial assistance due to his aneurysm, and a history of cannabis dependence.  *Id.*  Plaintiff's primary diagnosis at Portage Path was major depressive disorder, in partial remission, intermittent explosive disorder, and cannabis dependence.  *Id.* at 320-321.  It was noted that Plaintiff was actively engaged in his community and functioning well at his last contact.  *Id.* at 322.

On January 28, 2011, Plaintiff was admitted to the hospital for pre-admission testing for the cranioplasty. ECF Dkt. #12 at 510.  Plaintiff's medical history was noted, and Plaintiff had reported that since his ruptured aneurysm and craniotomy in 2005, he had experienced short-term memory loss.  *Id.*

On January 31, 2011, Dr. Muakkassa performed a right methyl methacrylate cranioplasty on Plaintiff's right skull defect.  ECF Dkt. #12 at 508-509.  Plaintiff was discharged from the hospital on February 2, 2011.  *Id.* at 326.

On February 15, 2011, Plaintiff followed up with Dr. Muakkassa following his cranioplasty ECF Dkt. #12 at 497.  He stated that he felt throbbing when he pressed on the cranioplasty and he felt air movement when he pressed on it.  *Id*.  Dr. Muakkassa found that the incision was healing well, but quite a bit of scabbing had formed on the inferior aspect of the incision above the ear.  *Id.* He removed the sutures, prescribed medication, and requested that Plaintiff return in one week.  *Id*.

**III.**    **SUMMARY OF TESTIMONIAL EVIDENCE**

At the hearing, Plaintiff, through counsel, moved to amend his alleged disability onset date from January 1, 1991 to June 24, 2009, the date of the filing of his SSI application.  ECF Dkt. #12 at 32.  Plaintiff explained that he was unable to work because he had an inner cranial aneurysm in 2005 which rendered him unable to stand as long as he used to, unable to bend down, and caused him short-term memory loss and an inability to concentrate on one task for a long period of time. *Id.* at 34, 37.  He related that he attend college at The University of Akron and The Ohio State University and had about a year's worth of credits and he attended Zane State while in prison and majored in microcomputers and small business.  *Id*. at 34-35.

Upon questioning by his counsel, Plaintiff related that he was living in an apartment complex for individuals with disabilities, including traumatic brain injuries.  ECF Dkt. #12 at 42.  Plaintiff explained that the complex serves people who have brain injuries and those trying to get off drugs and alcohol.  *Id.* at 49.  He indicated that he receives assistance by living there in that a caseworker takes him to the grocery store and a neighbor helps him clean, prepare food, and does the laundry and the dishes.  *Id.*

Plaintiff also testified that he worked at restaurants at various times from 1991 and the longest time that he worked at one place was for three months. ECF Dkt. #12 at 43.  He testified that he was arrested in 1994 for robbery and received an indefinite prison sentence of two to ten years but because he failed to report when he was released on parole three separate times, his parole was revoked and he was jailed.  *Id*. at 47.  He explained that when he went back to jail the third time in 2002, he "caught another case" for burglary and spent additional time in prison until May of 2009. *Id*., ECF Dkt. #12 at 125.

As to his impairments, Plaintiff related that he has difficulty remembering things in the short term and he relies upon notes posted all over his apartment to help him remember things. ECF Dkt. #12 at 51. He indicated that he was not receiving treatment for his memory loss. *Id*. He also stated that he had problems with his balance and he walked with a limp. *Id*. at 51-52. He further indicated that he was not currently receiving treatment from Portage Path for his depression because of his recent brain surgery. *Id.* at 54. He related that he owns a computer and likes to play video games, he saw friends from his church every Sunday and Wednesday, and he likes to watch movies. *Id*. at 54-56. He further explained that a prison doctor gave him a cane to use because he was off balance, but he no longer used it even though he still falls down. *Id*. at 55-56. He also explained that he suffers from fatigue due to his brain injury, he naps three times a day, and the biggest problem he foresaw with working full-time at even a very simple job would be that he would be unable to stay focused on the tasks assigned to him. *Id*. at 59.

The ALJ thereafter questioned the VE and presented hypothetical individuals to the VE with various restrictions. ECF Dkt. #12 at 60-65. Plaintiff's attorney thereafter questioned the VE as well, adding restrictions to the hypothetical individuals presented by the ALJ. *Id*. at 65-68.

## IV.     SUMMARY OF RELEVANT PORTIONS OF ALJ'S DECISION

In his March 15, 2011 decision, the ALJ determined that Plaintiff suffered from residual deficits stemming from aneurysm repair, depression, and personality disorder, which all qualified as severe impairments under 20 C.F.R. § 416.920, *et seq*. ECF Dkt. #12 at 15. The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). *Id*. He partially discounted Plaintiff's allegations of the limiting effects of his symptoms and concluded that Plaintiff had the RFC to perform light work with the following limitations: frequently climbing ramps and stairs; never crouching; never climbing ladders, ropes, or scaffolds; occasionally stooping, kneeling or crawling; having a sit-stand option; performing slower-paced, repetitive, routine tasks and some complex tasks; having no interaction with the general public; having only occasional contact with co-workers and supervisors; and he could engage in telephone contact. *Id*. at 17.

-11-

Based upon this RFC and the testimony of the VE, the ALJ found that Plaintiff could not return to his past relevant work, but he could perform jobs existing in significant numbers in the national economy, including the representative occupations of a marker, order caller or a ticket seller.  ECF Dkt. #12 at 24.

## V.      STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to SSI. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## VI.     STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings

-12-

of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011), quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

**VII.**    **ANALYSIS**

    **A.**    **EVALUATION AND INCORPORATION OF OPINION EVIDENCE**

Plaintiff first asserts that the ALJ committed reversible error when he attributed "significant" and "great" weight to the opinions of state agency medical sources Dr. Castor, Dr. Waggoner and Dr. Goldsmith but then failed to incorporate their limitations for Plaintiff into his RFC.  ECF Dkt. #14 at 6-8.  The undersigned recommends that the Court find no merit to Plaintiff's assertion that the ALJ erred in failing to incorporate the limitations of Drs. Waggoner and Goldsmith into his RFC for Plaintiff.  Further, the undersigned recommends that while the Court may find that the ALJ may have committed error by not incorporating the two-hour standing limitation of Dr. Castor, it is harmless error.

A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1). In assessing the RFC, the ALJ considers all of the relevant medical and other evidence.  20 C.F.R. § 416.945(a)(3).  While the ALJ must consider and weigh the medical opinions of both treating and agency medical sources, the final responsibility for determining the claimant's RFC is expressly reserved to the Commissioner. 20 C.F .R. § 416.927(d)(2).

It is true that "the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight." *Douglas v. Comm'r of Soc. Sec.*, 832 F.Supp.2d 813, 823–24 (S.D.Ohio 2011). This occurs because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." *Id.*; § 416.927(d),(f); SSR 96–6p at *2–3. "Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas*, 832 F.Supp.2d at 823–24. However, while an ALJ "'must consider findings of [s]tate agency medical and psychological consultants,' he is 'not bound by any findings made by [s]tate agency medical or psychological consultants.'" *Renfro v. Barnhart*, 30 F. App'x 431, 436 (6th Cir.2002) (quoting 20 C.F.R. § 404.1527(f)(2)(i)).

Dr. Waggoner, an agency reviewing psychologist, provided a mental RFC assessment for Plaintiff.  Dr. Waggoner found that Plaintiff was moderately limited in his abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms; accept instructions and responding appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or displaying behavioral extremes; and respond appropriately to changes in the work setting.  ECF Dkt. #12 at 241-242.  She found Plaintiff to be markedly limited only in the ability to interact appropriately with the general public.  *Id*. at 242.  Dr. Waggoner found that Plaintiff was capable of routine and more complex tasks in a slower paced environment with no interaction with the general public.  *Id.* at 243.  On March 11, 2010, Dr. Goldsmith reviewed and affirmed Dr. Waggoner's findings.  *Id*. at 246.

In his decision, the ALJ discussed Dr. Waggoner's assessment and Dr. Goldsmith's case analysis report affirming Dr. Waggoner's findings and he explained that he gave their opinions great weight.  ECF Dkt. #12 at 21.  He thereafter incorporated their conclusions that Plaintiff could perform routine and complex tasks in a slower-paced work environment with no interaction with the general public.  *Id*. at 17.

-14-

Plaintiff takes issue with the ALJ's statement in his decision that Dr. Waggoner found Plaintiff to have "only a few moderate limitations." ECF Dkt. #14 at 7.  He argues that he had more than "a few" moderate limitations since Dr. Waggoner actually found Plaintiff moderately limited in 6 of 20 areas and markedly limited in one area.  ECF Dkt. #14 at 7.

The undersigned recommends that the Court find that this statement by the ALJ shows no prejudicial error or profound negative impact on the ALJ's decision or resulting RFC.  The ALJ's statement of the number moderate limitations found by Dr. Waggoner as "a few" is no more than a description and no prejudice or profound impact on the ALJ's decision is shown as a result since the ALJ adopted Dr. Waggoner's ultimate conclusion that Plaintiff could perform routine and some more complex tasks in a slower paced environment with no interaction with the general public.  *See* ECF Dkt. #12 at 17, 21, 243.

Plaintiff also asserts that the fact that the ALJ attributed great weight to Dr. Waggoner's findings but changed one of her opinions to actually benefit him has some negative bearing on the ALJ's determination in this case.  Plaintiff contends that the ALJ's finding that he was moderately limited in concentration, persistence and pace when Dr. Waggoner (and Dr. Goldsmith) found him only mildly limited in maintaining concentration, persistence or pace shows "no rational connection to his analysis or to the weight he assigned to the medical sources in the record."  ECF Dkt. #14 at 8; *see also* ECF Dkt. #12 at 16 and ECF Dkt. #12 at 237.  The undersigned recommends that the Court find that this assertion, which actually benefits Plaintiff, provides no basis for reversing the ALJ's determination since the ALJ ultimately adopted Dr. Waggoner (and Dr. Goldsmith's) limitations in full.

As to Dr. Castor, the agency examining physician who provided a physical examination and assessment, the ALJ accorded "significant" weight to his consultative assessment of Plaintiff's physical conditions.  ECF Dkt. #12 at 20.  Dr. Castor had concluded that Plaintiff could tolerate two hours or less of standing during an eight-hour workday and could sit for up to eight hours during the workday.  *Id.* at 212.  He also concluded that Plaintiff's employment would be limited by mobility and anything that would require him to crouch down and stand back up again.  *Id.*

-15-

In his RFC, the ALJ limited Plaintiff to light work that never involved crouching, had a sit-stand option, and involved slower paced work.  ECF Dkt. #12 at 17.  He did not, however, incorporate the two-hour standing limitation into his RFC.  The fact that the ALJ did not incorporate all of Dr. Castor's restrictions, despite attributing significant weight to his opinion, is not legal error in and of itself.  While an ALJ must consider and weigh medical opinions, the RFC determination is expressly reserved to the Commissioner. *Ford*, 114 F. App'x at 198.  Here, the ALJ explained the weight that he attributed to Dr. Castor's opinion and even though he was not required to adopt Dr. Castor's limitations for Plaintiff, the ALJ did adopt most of the limitations that Dr. Castor opined. *See Smith v. Comm'r of Soc. Sec*., No. 5:11CV2104, 2013 WL 1150133 (N.D. Ohio, Mar. 19, 2013)("[s]imply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight.").

However, it appears that the ALJ may have mistakenly omitted the only part of Dr. Castor's restriction that he did not adopt: the two hours or less of standing during an eight-hour workday. The ALJ clearly considered this limitation as evidenced by the transcript of the ALJ hearing where all of the hypothetical individuals that the ALJ presented to the VE contained this limitation.  ECF Dkt. #12 at 61-65.  Further, in her merits brief, the Commissioner of Social Security states that "[t]he ALJ properly concluded that Plaintiff could perform light exertional work that involved standing and/or walking with normal breaks of two hours in an eight-hour work day."  ECF Dkt. #15 at 16. The ALJ's decision does not include the two-hour walking/standing limitation. ECF Dkt. #12 at 17. Nevertheless, the VE testified that even with this limitation as presented by the ALJ at the hearing, light work occupations still existed that could be performed, which included the jobs ultimately relied upon by the ALJ in his decision.  Accordingly, although the ALJ may have erred in omitting the two-hour standing limitation in his decision, the undersigned recommends that the Court find that the omission was accidental and is not reversible error because substantial evidence supports the ALJ's analysis as to Plaintiff's RFC and the finding of his ability to perform the limited light work jobs presented by the VE that included a two-hour standing or walking limitation.

-16-

**B**.     **RFC**

Plaintiff also asserts that substantial evidence does not support the ALJ's RFC because some of the ALJ's findings show that he improperly summarized, mischaracterized and misinterpreted the evidence, which calls into question the ALJ's entire decision. ECF Dkt. #14 at 9. Plaintiff advances seven instances that he asserts support his argument.

The undersigned recommends that the Court find that even though the ALJ carelessly committed a number of errors in his findings, he nevertheless followed the required regulations and made sufficiently clear and specific findings that support his RFC for Plaintiff and substantial evidence supports his determination. *See Kobetic v. Comm'r of Soc. Sec.,* 114 Fed. App'x 171, 173, 2004 WL 2491074, at *2 (6th Cir. Nov. 4, 2004), citing *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969)(when "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") and *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)("[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result."). The undersigned addresses each of the seven alleged errors in turn.

### 1.     DR. CASTOR'S TEN POUND LIFTING LIMITATION

Plaintiff first contends that the ALJ erroneously interpreted Dr. Castor's opinion as to his ability to lift objects. ECF Dkt. #14 at 9. Dr. Castor stated in his opinion that Plaintiff "complains of Lt. leg weakness which affects him most with mobility and crouching down and standing back up or with picking up heavy items greater than 10#. The claimant otherwise has no other deficits on physical exam." ECF Dkt. #12 at 211. Dr. Castor thereafter found that Plaintiff could tolerate two hours or less of standing during an eight-hour workday and could sit eight hours of a workday, with his employment limited by his mobility and anything that would require him to crouch down and stand back up again. *Id.* at 211-212.

In his decision addressing Dr. Castor's opinion, the ALJ noted Dr. Castor's diagnoses for Plaintiff of left leg weakness and residual deficits stemming from an aneurysm repair. ECF Dkt. #12 at 23. However, the ALJ stated that Dr. Castor "determined that the claimant could lift heavy items

-17-

greater than ten pounds, could tolerate up to two hours of standing in an eight hour workday, could sit eight hours during an eight hour workday and that the claimant's employment would be limited by mobility as well as anything that would require the claimant to crouch down and stand back up again." *Id.*

The undersigned recommends that the Court find that the ALJ did commit error in making such a finding. It is obvious from reading Dr. Castor's report that he did not determine that Plaintiff could lift items greater than 10 pounds in weight. ECF Dkt. #12 at 210-212. Dr. Castor merely stated that Plaintiff indicated that he complained of trouble picking up heavy items weighing more than ten pounds. *Id.* at 211.

While the Court should find that the ALJ committed error, the undersigned recommends that the Court find that such error was harmless as substantial evidence supports the ALJ's lifting restriction for Plaintiff. The undersigned points out that Dr. Castor did not limit Plaintiff's ability to lift and carry objects in his opinion. ECF Dkt. #12 at 210-212. Moreover, no physician limited Plaintiff's ability to lift and carry objects and agency reviewing physicians found that Plaintiff had no severe medically determinable physical impairment. ECF Dkt. #12 at 245-247. Yet the ALJ nevertheless accepted Plaintiff's testimony that he had difficulty lifting and restricted Plaintiff's RFC to light work. ECF Dkt. #12 at 17. In supporting his RFC for Plaintiff, the ALJ also noted that repeated examinations showed that Plaintiff had good use of his arms. *Id.* at 18. In fact, Dr. Castor's manual muscle testing showed that Plaintiff had normal grasp, manipulation, pinch and fine coordination, with no muscle spasm, no muscle atrophy, and normal ranges of motion in his neck, arms, shoulders, elbows and wrists, as well as in his hands and fingers. ECF Dkt. #12 at 214-215. Moreover, treatment notes show that Plaintiff's extremities had no clubbing or edema, his neurological exams were mainly normal, and his complaints did not focus on his arms or shoulders, but rather on back pain, memory loss, and trouble standing, walking and crouching and getting back up again. *Id.* at 247, 251-252, 256, 259-260, 262-263, 265-266, 268, 332, 391, 511. Moreover, as also pointed out by the ALJ, Plaintiff presented to his primary care doctor in order to apply for disability and stated his grounds for disability as his trouble walking and standing and his inability to bend over or get on his knees. *Id.* at 265. The doctor found a normal physical examination and

-18-

no evidence of grounds that warranted disability. *Id*. at 266. For these reasons, the Court should find that substantial evidence supports the ALJ's light work lifting requirement for Plaintiff and any error by the ALJ as to Plaintiff's ability to lift and carry objects was harmless.

### 2. CONSERVATIVE TREATMENT AND LONG-TERM HOSPITALIZATIONS

Plaintiff also takes issue with the ALJ's statement that Plaintiff could perform the limited light work RFC that he determined "[g]iven all of the factors analyzed in this case, including but not limited to the conservative treatments offered to the claimant, the relative lack of strongly positive clinical findings documented in treatment notes and the claimant's activities of daily living." ECF Dkt. #14 at 10, citing ECF Dkt. #12 at 23. Plaintiff asserts that his treatments were far from conservative and his daily living activities were not inconsistent with the alleged severity of his impairments. ECF Dkt. #14 at 10-11.

The undersigned agrees with Plaintiff that his treatment for his brain aneurysm and repair have been far from conservative. He underwent the aneurysm repair in 2004, was admitted to the hospital in August 2010 for cranial osteomyelitis and epidural abscess which required a craniectomy and drainage of the abscess with discharge to a nursing home for two months thereafter. ECF Dkt. #12 at 331, 510, 513. He also underwent a right methyl methacrylate cranioplasty to have a metal plate installed in his head on January 31, 2011. *Id*. at 337, 508.

However, the undersigned disagrees with Plaintiff's additional complaint that the ALJ erroneously remarked that his medical records contained no evidence of "long-term hospitalizations, commitments, severe psychotic episodes or incidents of self-harm or harm to others associated with his diagnosis of depression and personality disorder." ECF Dkt. #14 at 10-11, quoting ECF Dkt. #12 at 20. Plaintiff refers the Court to the ALJ's discussions in his decision located three paragraphs from this statement in which the ALJ noted that medical records showed a history of angry outbursts and placement in the mental health unit while Plaintiff was incarcerated. ECF Dkt. #14 at 10-11, citing ECF Dkt. #12 at 19. Plaintiff contends that these records show long-term hospitalization or commitment. ECF Dkt. #14 at 11. The undersigned recommends that the Court find that substantial evidence supports the ALJ's finding on this issue as a history of angry outbursts noted on a mental

status questionnaire completed by Portage Path Behavioral Health and a notation from Dr. Leidal that Plaintiff related that he was placed on the mental heath unit in prison for depression and anxiety over his lengthy prison sentence are insufficient evidence to show a long-term hospitalization, commitment, severe psychotic episode or incidents of self-harm or harm to others.  *Id*.

Despite the ALJ's error with regard to finding only conservative treatment, the undersigned recommends that the Court find that substantial evidence supports the ALJ's determination that Plaintiff was not disabled.  The ALJ obviously considered all of Plaintiff's treatment relating to the residual effects from his aneurysm repair, as evidenced by his decision which outlined the testing and procedures that Plaintiff underwent from 2004 through January of 2011.  ECF Dkt. #12 at 18-19. The ALJ noted the positive outcomes from the various procedures and the various clinical examination findings that showed stability and no disabling residual effects from the aneurysm. The ALJ cited to a December 27, 2010 CT scan of Plaintiff's brain which showed interval resolution of soft tissue inflammatory changes and fluid collections and no clear evidence of active infectious or inflammatory process.  ECF Dkt. #12 at 18, citing ECF Dkt. #12 at 507.  The ALJ also noted Plaintiff's discharge from the nursing home in good condition with good rehabilitation and progress potential after antibiotic treatment following his August 2010 craniotomy.  ECF Dkt. #12 at 19, citing ECF Dkt. #12 at 282.   He further noted Plaintiff's stable condition and successful cranioplasty in January of 2011.  ECF Dkt. #12 at 19.

The ALJ also cited to the various clinical findings that supported his determination, including Dr. Castor's examination findings of a completely normal neurologic exam in September of 2009 with grossly intact cranial nerves, normal speech patterns, clear articulation, intact fine motor skills, no lower extremity edema, intact peripheral pulses, ability to get on and off of the examination table and touch his toes, and only some left leg weakness with flexion and extension and a slight limp. ECF Dkt. #12 at 19, citing ECF Dkt. #12 at 211.  The ALJ further cited to a primary care physician's July 21, 2009 finding upon examination that Plaintiff presented no evidence of grounds for disability.  ECF Dkt. #12 at 19, citing ECF Dkt. #12 at 266.  The ALJ also cited to a CT scan and treatment notes showing that after his August 2010 craniotomy, Plaintiff was doing well.  ECF Dkt. #12 at 18, citing ECF Dkt. #12 at 507, 499.  The CT scan performed on December 27, 2010 showed

interval resolution of soft tissue inflammatory changes and fluid collections and no clear evidence of active infectious or inflammatory process.  ECF Dkt. #12 at 507.  A December 2, 2010 treatment note showed that Plaintiff had normal mental status, normal recent and remote memory and concentration, normal language and speech, clear speech, and no atrophy or tremors.  *Id.* at 499. Plaintiff's limp was noted and attributed to the repair of his aneurysm.  *Id.*

Accordingly, while the ALJ should not have stated that Plaintiff had only conservative treatment, the undersigned recommends that the Court find that his decision nevertheless reflects that he considered the numerous procedures and treatments that Plaintiff endured relating to his aneurysm repair and its residual effects and nevertheless found that Plaintiff was not disabled from them.  Moreover, the undersigned recommends that the Court find that substantial evidence supports the ALJ's determination that Plaintiff was not disabled for social security purposes from his aneurysm repair and its residual effects.

### **3**.        **CREDIBILITY/ACTIVITIES OF DAILY LIVING**

Plaintiff also challenges the ALJ's finding that his testimony regarding his daily living activities was inconsistent with the alleged severity of his impairments.  ECF Dkt. #14 at 11. Plaintiff contends that his testimony at the hearing was entirely consistent with his daily living activities and the ALJ erred in relying upon statements that Plaintiff made in a questionnaire that was completed prior to his two most recent surgeries.  *Id.*  Plaintiff asserts that the ALJ's finding on this matter creates "serious doubt" as to the accuracy of his determination.

The social security regulations establish a two-step process for evaluating pain.  *See* 20 C.F.R. § 404.1529 , SSR 96-7p.  In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain.  *See id.; Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986).  Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment

exists that could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990).  These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039-40. Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination.  *See Casey*, 987 F.2d at 1234. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

The undersigned recommends that the Court find that substantial evidence supports the ALJ's credibility determination, even despite some differences between Plaintiff's answers on his functional questionnaire and his testimony at the hearing as to his activities of daily living.  The undersigned notes that the ALJ did not err in considering Plaintiff's answers in the 2009 functional questionnaire because they were the activities reported by Plaintiff at a relevant time period since his amended onset date of June 24, 2009 and the questionnaire was completed on July 16, 2009. ECF Dkt. #12 at 155.  Thus, Plaintiff's activities of daily living are relevant to the ALJ's determination.

While the ALJ should have articulated some of Plaintiff's most recent activities that he testified to at the hearing, the activities that Plaintiff reported performing in the earlier questionnaire were not that different from the activities that he reported to the ALJ at the hearing.  For instance,

-22-

in his questionnaire, Plaintiff reported that he sometimes went to the library and his hobbies included reading, watching television and playing video games on a computer.  ECF Dkt. #12 at 150, 153. At the hearing, Plaintiff testified that he no longer had to travel to the library to get books or play on the computer because a book mobile came to his apartment complex and he now had his own computer.  *Id*. at 52-53.  He testified that he still liked reading, playing video games and watching movies.  *Id*. at 53-55.  Plaintiff further reported in his questionnaire that he had no problem dressing, bathing, caring for or feeding himself and he could do laundry, clean and iron.  *Id.* at 151-152.  He also stated in the questionnaire that he did not prepare his own meals because the facility where he resided brought meals in to him.  *Id.*  He testified at the hearing that he could prepare a simple meal like breakfast, but he could not prepare a full meal like dinner with vegetables and a caseworker takes him to the grocery store and a neighbor helps him prepare meals and clean his apartment, and she does his laundry and washes his dishes.  *Id*. at 49-50.  He also indicated in the questionnaire that he went outside three to four times per week and walked, he used public transportation, and he shopped for clothes and hygiene items.  *Id*. at 152. He also stated that he spent time with others and liked to talk with them and go to the movies.  *Id*. at 153.  At the hearing, Plaintiff testified that he spends time with people from his church doing activities and he spends time every Sunday and Wednesday with them helping distribute food and clothes to the needy for three or four hours on Wednesdays and two to three hours on Sundays.  *Id.* at 53-54.

The only real difference between Plaintiff's answers to the functional questionnaire and his testimony at the hearing was the fact that a neighbor does his laundry and washes his dishes.  The undersigned recommends that the Court find that this difference is not significant enough to have an impact of to "cast doubt" on the accuracy of the ALJ's credibility determination.  The ALJ cited to SSR 96-7p, reviewed the appropriate factors, which included Plaintiff's activities of daily living, the location, duration, frequency and intensity of Plaintiff's pain, things that aggravated or relieved his pain, the medications he was taking, treatment that he received, and the opinions and statements of Plaintiff's doctors and the agency examining and reviewing doctors.  *Felisky*, 35 F.3d at 1039-40. The ALJ reviewed the medical and non-medical evidence and had substantial evidence to support his discounting of Plaintiff's credibility.

Accordingly, the undersigned recommends that the Court find no merit to Plaintiff's assertion that the ALJ's use of the 2009 answers to the functional questionnaire casted doubt on the accuracy of his credibility determination.

### 4.    RESEARCH ON TRAUMATIC BRAIN INJURIES

Plaintiff also alleges reversible error based upon the ALJ's statement in his decision commending Plaintiff for his research and efforts and notation that Plaintiff was well-studied about traumatic brain injuries.  ECF Dkt. #14 at 12.  Plaintiff asserts that he did not research traumatic brain injuries but merely related that which was told to him by his doctors and given to him through informational fliers.  *Id.*

The undersigned recommends that the Court find no reversible error resulting from this statement.  The ALJ noted in his decision that:

> The claimant testified that he studied various files and studies regarding traumatic brain injuries. The claimant answered multiple questions by stating, "well, with any traumatic brain injury..." and explained clinical limitations.  The undersigned commends the claimant's research and efforts, and notes that he was well-studied.

ECF Dkt. #12 at 22.  During the hearing, the ALJ asked Plaintiff about beginning his statements with "with any traumatic brain injury."  *Id.* at 57.  The ALJ asked where Plaintiff was obtaining his information and Plaintiff responded that he received his information from his doctors.  *Id*. at 58.  He also answered the ALJ's question as to whether he did any research himself by stating that:

> Part of belonging to the TBI, the Traumatic Brain Injury, they give out different fliers on differ[sic] aspects of having a traumatic brain injury.  And in those fliers it tells you different areas of what a person may have to endure and what they are going through so - -

*Id.* While it appears from this statement that Plaintiff did not conduct his own in-depth research into studies on traumatic brain injuries, the undersigned recommends that the Court find that Plaintiff did have some informational materials on traumatic brain injuries and no prejudicial or reversible error resulted from the ALJ's statement commending Plaintiff as to his knowledge about traumatic brain injuries.

### 5.    MEMORY PROBLEMS

Plaintiff further complains that the ALJ illogically chose to focus on his long-term memory rather than his short-term memory in discounting his allegations of short-term memory loss.  ECF

Dkt. #12 at 12.  The ALJ noted that Plaintiff had complained of short-term memory loss and stated that it was one of the reasons why he could not return to full-time work.  *Id.* at 18.  The ALJ also stated that:

> However, the undersigned notes that the claimant was able to explain in great detail all of the circumstances surrounding his extensive criminal history.  He was also able to explain in great detail extensive information concerning his work history.

*Id.* at 22.  If this were the only reason advanced by the ALJ to support his discounting of Plaintiff's credibility regarding his short-term memory loss, the undersigned would agree with Plaintiff that it could raise questions of reversible error because it does appear from this statement that the ALJ focused on Plaintiff's remote recall in order to discount his allegations of short-term memory loss.

However, the ALJ also reviewed the opinions of the state agency medical sources and gave great weight to the opinion of Dr. Leidal, the agency examining psychologist.  ECF Dkt. #12 at 21, citing ECF Dkt. #12 at 221.  Dr. Leidal had indicated upon examination of Plaintiff that his recall for past and recent life events and the presentation of personal history was fair.  ECF Dkt. #12 at 221.  Dr. Leidal also stated that Plaintiff's intelligence appeared average and his memory functions "such [as] recall of present and past events or incidental memory appeared to be commensurate with intelligence."  *Id.*  He opined that Plaintiff's ability to follow short, simple instructions and more detailed instructions was not impaired and his ability to understand and execute more complex instructions was moderately impaired.  *Id.* at 223.

The ALJ also gave great weight to the opinions of Dr. Waggoner, the agency reviewing psychologist, who opined that Plaintiff was not significantly limited in his abilities to remember locations and work-like procedures or in understanding and remembering very short and simple instructions or detailed instructions.  ECF Dkt. #12 at 21, citing ECF Dkt. #12 at 241.  Dr. Waggoner had also found that Plaintiff was not significantly limited in carrying out very short and simple instructions and was only moderately limited in his ability to carry out detailed instructions.  *Id.*  She opined that Plaintiff was capable of routine and more complex tasks in a slower paced environment with no interaction with the general public.  *Id.* at 243.

Thus, the ALJ relied upon the opinions of Dr. Leidal and Dr. Waggoner and adopted their opinions by limiting Plaintiff to light work that involved slower-paced, repetitive and routine tasks,

-25-

some of which could be complex.  ECF Dkt. #12 at 17.  Since the ALJ relied upon evidence other than only this statement regarding Plaintiff's ability to recall more distant events, the undersigned recommends that the Court find that substantial evidence supports his determination.

### 6.    DR. LEIDAL'S FINDINGS

Plaintiff also asserts that the ALJ completely disregarded Dr. Leidal's finding that Plaintiff's most serious functional problems are moderate to marked impairment in social and occupational functioning and judgment.  ECF Dkt. #14 at 13.  Dr. Leidal did indeed opine that these were Plaintiff's most serious functional problems.  ECF Dkt. #12 at 222.  He thereafter opined that Plaintiff's ability to obtain some kind of productive employment was not impaired from a psychological perspective.  *Id*. at 223.  However, Dr. Leidal further stated that "[t]he claimant's ability to maintain employment, adapt to the work environment and tolerate the stressors of the work environment and complete a normal workday is moderately to markedly impaired."  *Id.*  Plaintiff contends that the ALJ did not mention these limitations from Dr. Leidal's opinion.  *Id*.

The ALJ discussed Dr. Leidal's opinion and gave it great weight.  ECF Dkt. #12 at 21.  He cited Dr. Leidal's opinion that Plaintiff's ability to tolerate work stressors and to respond to instructions was moderately to markedly impaired.  *Id*.  The ALJ accordingly limited Plaintiff to slower-paced light work with repetitive and routine tasks and some complex tasks and no interaction with the general public and only occasional contact with co-workers and supervisors.  *Id*. at 17.  The ALJ also gave great weight to the opinions of Dr. Waggoner, the agency reviewing psychologist.  *Id.*  Dr. Waggoner had reviewed Dr. Leidal's opinion, and had reviewed prison records and the records received from Portage Path.  ECF Dkt. #12 at 243.  She noted that the Portage Path records indicated that Plaintiff had no problems with adaptation or reaction to pressures in the work setting.  *Id*.  After reviewing all of the medical evidence, she opined that Plaintiff was only moderately impaired in accepting instructions and responding appropriately to criticism from supervisors and in responding appropriately to changes in the work setting.  *Id*. at 242.  She found Plaintiff able to  perform routine and more complex tasks in a slower-paced environment with no interaction with the general public.  *Id*. at 243.

"Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions." SSR 96–6p, 1996 WL 374180, *2 (Jul. 2, 1996). The ALJ in this case explained the weight that he attributed to the opinions of Dr. Leidal and Dr. Waggoner.  However, the Sixth Circuit has held that the regulation requiring an ALJ to provide good reasons for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of several examining physicians' opinions over others. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 506 (6ᵗʰ Cir. Feb.9, 2006).  Further, while the regulations state that the Commissioner will "[g]enerally, ... give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you," the ALJ is the one who has a duty to evaluate all of the medical opinions in the record and resolve any conflicts. 20 C.F.R. §§ 404.1527(c)(4) & (e)(2). The regulations also state that the supportability of an opinion, as well as the extent to which a source is familiar with a claimant's other medical information of record, should also be factored into the decision of how much weight to ascribe to a medical source. 20 C.F.R. §§ 404.1527(d)(3) & (6).  The Sixth Circuit has held that "a non-examining physician's opinion may be accepted over that of examining doctors when the non-examining physician clearly states the reasons for his differing opinion." *Carter v. Comm'r of Soc. Sec.*, 36 F. App'x 190 (6ᵗʰ Cir.2002) (citing *Barker v. Shalala*, 40 F.3d 789, 794 (6ᵗʰ Cir.1994)).

Here, Dr. Leidal noted in his opinion that Plaintiff's psychiatric records and other relevant psychiatric evidence were not available to him.  ECF Dkt. #12 at 220.  Dr. Waggoner noted in her opinion that Plaintiff had treated at Portage Path and she cited the medical statement from Portage Path which concluded that Plaintiff had no problems with reaction to pressures in a work setting. *Id*. at 243.  She indicated that while the treating source signing the medical statement from Portage Path was not an acceptable source, the statement was not inconsistent with Dr. Leidal's conclusions and she had considered the statement in forming her opinion.  *Id*.  Thus, Dr. Waggoner had before her evidence that Dr. Leidal did not.  While it was not per se an acceptable medical source because of the individual who signed it, Dr. Waggoner nevertheless considered the findings and opinions since Portage Path had treated Plaintiff for a period of time.  *Id*.  The ALJ gave Dr. Waggoner's

-27-

opinion great weight as well, noting that she had reviewed Plaintiff's medical records. *Id.* at 21.

Based upon these opinions and the other medical and nonmedical evidence of record, the ALJ determined a RFC for Plaintiff. A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 416 .945(e). Accordingly, the ALJ bears the ultimate responsibility for assessing a claimant's RFC, based on all of the relevant evidence. *See* 20 C.F.R. § 416.945(a). The ALJ in this case rendered a RFC that was supported by substantial evidence and the fact that he did not incorporate all of Dr. Leidal's limitations or explain why he did not adopt them in full was not legally required. Accordingly, the Court should find no merit to Plaintiff's assertion.

The undersigned points out that these six areas presented by Plaintiff do highlight that the ALJ's decision in this case was somewhat careless and by no means perfect. However, the undersigned recommends that the Court find that the errors that the ALJ committed did not result in reversible error as the ALJ followed the required regulations and substantial evidence supported his determinations.

### 7. VE TESTIMONY

Plaintiff also complains that the ALJ omitted critical information that "significantly changes the facts in the record" when he stated in his decision the wrong number of jobs available that the hypothetical person with Plaintiff's background and RFC could perform. ECF Dkt. #14 at 13. At the hearing, the ALJ presented the VE with a second hypothetical person with Plaintiff's age, education, work experience and the RFC to lift and/or carry up to ten pounds frequently and twenty pounds occasionally; stand and/or walk up to two hours per eight-hour workday; sit for up to six hours per workday, and the additional limitations of frequently climbing ramps and stairs, never climbing ladders, ropes or scaffolds, occasionally stooping, kneeling or crawling, no crouching, a sit/stand option, and limited to slower-paced and routine and repetitive work, with some more complex tasks that provide for no interaction with the general public, only occasional contact with coworkers and supervisors, and telephone contact. ECF Dkt. #12 at 62-63. The VE testified that such a hypothetical person could perform the representative occupations of a marker, an order caller, and a ticket seller. *Id.* at 63-64. The VE indicated that over 500,000 positions of a marker existed

in the national economy and 8,000 in the local and regional economy, and over 500,000 positions for an order caller existed in the national economy and 10,000 existed in the State of Ohio.  *Id.* at 63.

As to the ticket seller statistics, the VE testified that over 1 million such positions existed in the national economy and 50,000 in the local and regional economy.  ECF Dkt. #12 at 64.  However, the VE stated that those numbers would be reduced by 70 percent based upon "the telephonic or internet sales only."  *Id.*  In his decision, the ALJ found that the VE testified that the hypothetical individual could perform the representative occupations of:

> a marker with 8,000 such jobs available in the state of Ohio and 500,000 nationwide; an order caller with 10,000 such positions available in the state of Ohio and 500,000 nationwide; and a ticket seller with 50,000 such jobs available in the state of Ohio and 1,000,000 nationwide

.
ECF Dkt. #12 at 24.

Plaintiff asserts that the ALJ's error in not reducing the ticket seller jobs by 70 percent "seriously calls into question the integrity of this decision and the accuracy of the so-called facts upon which the ALJ relied."  ECF Dkt. #14 at 14.  The undersigned again agrees that the ALJ committed error by carelessly indicating the number of ticket seller jobs available without reducing this number by 70 percent as testified to by the VE.  Again, however, the undersigned recommends that this error is not prejudicial or reversible error, in that the other occupations of order caller and marker still presented a significant number of jobs existing in the national economy and that even the reduced numbers of the ticket seller, either alone or coupled with the other representative occupations, met the ALJ's Step Five burden.

### C.     OTHER ARGUMENTS

Plaintiff advances three other arguments that he asserts establish that substantial evidence is lacking for the ALJ's decision.  The first concerns the ALJ's finding that Plaintiff's aneurysm presented no symptoms that would substantially interfere with the claimant's workplace capabilities in one portion of the decision and his Step Two finding that Plaintiff's aneurysm was severe, which by definition is an impairment "which significantly limits your physical or mental ability to do basic work activities."  ECF Dkt. #14 at 14.

The undersigned recommends that the Court find no merit to this assertion.  The undersigned points out that the ALJ did not find at Step Two that Plaintiff's aneurysm itself was a severe impairment.  Rather, he found that Plaintiff's "residual deficits stemming from an aneurysm repair" constituted a severe impairment.  ECF Dkt. #12 at 15.  Thus, the ALJ's subsequent finding that the medical evidence showed that Plaintiff's aneurysm presented no symptoms that would substantially interfere with Plaintiff's workplace abilities is not inconsistent with his Step Two finding or is unsupported when the ALJ cited to medical records showing that the aneurysm itself was repaired and presented no additional problems or restrictions.  ECF Dkt. #12 at 19.

Plaintiff contends in his second argument that the ALJ contradicted himself when he found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but then also found that "the objective medical evidence fails to document an impairment or combination of impairments which would be expected to result in disabling symptoms."  ECF Dkt. #14 at 14, quoting ECF Dkt. #12 at 22.

The undersigned sees no such contradiction.  The ALJ's first statement in his analysis of Plaintiff's credibility merely explains that he finds it reasonable to believe that Plaintiff's severe impairments of residual deficits from his aneurysm repair, his depression and his personality disorder, could cause the symptoms that he alleged, which included an inability to bend or stand for prolonged periods of time, short-term memory loss and problems with concentration.  ECF Dkt. #12 at 18.  In other words, the ALJ analyzed the first prong of the *Duncan* pain analysis and determined whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce Plaintiff's pain or other symptoms.  *Duncan,* 801 F.2d at 853.  The ALJ's second statement concerns the second prong of the *Duncan* analysis, that is, after finding that Plaintiff had an underlying physical and mental impairment that could reasonably be expected to produce his pain or symptoms, the ALJ determined that the evidence of record failed to establish that the intensity, persistence, and limiting effects of Plaintiff's symptoms limited his ability to do basic work activities so as to find him disabled under the social security regulations.

For these reasons, the undersigned recommends that the Court find no merit to Plaintiff's assertion.

-30-

Finally, Plaintiff contends that the ALJ selectively chose portions of the medical opinions to incorporate into his RFC "despite assigning all of the opinions either great or significant weight." ECF Dkt. #14 at 15.  Plaintiff complains that the ALJ disregarded Dr. Waggoner's restriction that Plaintiff could have no interaction with the public as he assigned her opinion great weight and yet found that Plaintiff could engage in telephone contact.  *Id.*

The Court should find no merit to this assertion.  As explained above, the ALJ is not required to adopt all of a medical source's findings or opinions as the ALJ makes the ultimate determination as to a claimant's RFC.  Moreover, Plaintiff provides no evidence that a limitation to no interaction with the general public restricts an ability to engage in telephone contact with the public.  In addition, even if the telephone contact ability were eliminated, the ALJ noted that significant number of jobs in the national economy nevertheless existed according to the VE as the VE testified that only the ticket seller job would be impacted by a no telephone contact restriction.  ECF Dkt. #12 at 24, 64.  This would still leave the representative occupations of a marker and an order caller, both of which had significant numbers of jobs available in the national economy.  *Id.* at 64.

## VIII.    CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's complaint in its entirety with prejudice.


DATE: August 6, 2013                                 */s/George J. Limbert*
                                                      GEORGE J. LIMBERT
                                                      UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72; L.R. 72.3.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).